Submitted on briefs without argument Sept. 27, decided Nov. 29, 1910. Rehearing granted April 4, decided on rehearing July 5, 1911. Further order on respondent's petition for rehearing Aug. 1, 1911.

## MILES v. HEMENWAY.

[111 Pac. 696: 117 Pac. 273.]

SPECIFIC PERFORMANCE—ACTIONS—SUFFICIENCY OF EVIDENCE.

1. In an action to compel specific performance of an agreement to convey upon payment of the remainder of the purchase price, evidence *held* to show that there was no meeting of minds of the parties on the proposition that a quitclaim deed of the land, executed by the purchaser and deposited in escrow, was given only as additional security for the purchase price, and not as a surrender of his interest.

VENDOR AND PURCHASER—RELATION UNDER CONTRACT.

2. An executory agreement to sell and convey realty is treated as a conversion whereby an equitable interest in the land is acquired by the purchaser, for whom the vendor holds the legal title in trust.

VENDOR AND PURCHASER—REMEDIES OF VENDOR—FORECLOSURE.

3. The vendor's right to the agreed price is an equitable lien upon the land which, upon default in the payment of the amount awarded by the court in a suit for strict foreclosure, may become merged in the legal estate under the decree, which should provide a definite time for payment of the debt, upon failure of which the purchaser's equitable estate will be barred, and such foreclosure suit is not governed by Section 423, B. & C. Comp., directing liens upon realty to be foreclosed and the land sold to satisfy the debts, and that if a personal obligation is given to secure payment of the sum due, the recovery must be based thereon; and hence a decree foreclosing the contract, should not direct a sale of the premises.

Vendor and Purchaser—Remedies of Purchaser—Foreclosure of
    Contract—Necessity.

4. Defendant agreed to convey realty to plaintiff, part of the price
being paid down and the remainder to be paid in installments with a
provision for forfeiture for nonpayment, and the vendor deposited a
warranty deed in escrow for the purchaser upon complete payment. On
the purchaser's failure to meet one of the installments, the vendor agreed
to extend the time of its payment if the purchaser would execute a
quitclaim deed to the property, to be deposited with the warranty deed
under an agreement that upon the purchaser's failure to pay at the
time as extended, the original contract, warranty deed, quitclaim deed,
and supplemental agreement under which it was executed, should be
delivered to the vendor, and the transaction closed. *Held*, that the quit-
claim deed was not self-executing, but could be enforced only by a
decree of strict foreclosure or other equitable intervention or by mutual
assent of the parties, in order to cancel the contract and bar the pur-
chaser's rights thereunder.

Specific Performance—Action—Sufficiency of Evidence.

5. In an action to compel specific performance of an executory con-
tract to convey, evidence *held* to show that defendant did not attempt
to hinder plaintiff from borrowing money with which to pay the install-
ment due under the contract.

Specific Performance—Action—Sufficiency of Evidence.

6. In an action to compel specific performance of an executory con-
tract to convey, in which it appeared that the purchaser, on his default
in a payment, executed a quitclaim deed to the premises, and deposited
it in escrow along with the original contract and the vendor's deed,
evidence *held* to show that before the purchaser was able to obtain a
loan to pay installments due, he unconditionally directed the bank hold-
ing such papers in escrow to deliver them to defendant.

Vendor and Purchaser—Remedies of Parties—Mutual Rescission.

7. An executory contract for the sale of land may be rescinded by
the mutual assent of the parties.

Vendor and Purchaser—Rights of Vendor—Forfeiture.

8. The forfeiture of the purchaser's rghts under a contract to convey,
pursuant to a provision thereof, is usually not complete without affirma-
tive action by the vendor, so that if a declaration of forfeiture was
essential to terminate the purchaser's right under an executory contract
to convey, a supplemental agreement extending the time for a payment
then due under the original contract, made in consideration of the pur-
chaser's execution of a quitclaim deed in escrow, to be delivered to the
vendor on the purchaser's failure to pay within the time extended, would
not affect the rights of the parties so as to transfer the property to the
vendor without a declaration of forfeiture.

Vendor and Purchaser—Forfeiture—Mutual Rescission.

9. While equity favors compensation and not forfeitures, parties *sui
juris* may settle their rights by mutual agreement, so that where, on
the purchaser's failure to pay an installment within the stipulated time,
he, in consideration of an extension of such time, executed a quitclaim
deed to the vendor, which was deposited in escrow with the original
contract and the vendor's deed, all of which were to be delivered to

the vendor on the purchaser's failure to pay within the time extended, a delivery by the bank holding such papers after the expiration of the extended time, without payment to the vendor pursuant to the purchaser's direction and their acceptance by the vendor, was equivalent to a declaration of forfeiture by him which was assented to by the purchaser by directing their delivery, so as to operate as a surrender of the rights of the parties under the contract.

VENDOR AND PURCHASER — REMEDIES OF VENDOR — RESCISSION — RE-
DELIVERY OF NOTES.
10. Where the vendor believed that the purchase money notes were also delivered in escrow to the bank so holding the deeds, and on the purchaser's default in payment told the bank to deliver the notes to the purchaser, the bank's failure to deliver them until several days after the vendor's declaration of forfeiture for nonpayment would not affect the rights of the parties, though the notes had been unconditionally delivered to the vendor and were not technically in escrow.

VENDOR AND PURCHASER—CONTRACT TO CONVEY—RESCISSION.
11. Rescission by the parties of a contract to convey, contemplates not only destruction of the contract, but also restoration of the parties to their former estate or situation.

VENDOR AND PURCHASER—CONTRACT TO CONVEY—RESCISSION.
12. A contract purchaser, being in default in paying an installment of the price, executed a quitclaim deed to the vendor, which was placed in escrow under agreement that, in consideration of an extension of time for payment, the deed, together with the original deed from the vendor, should be delivered to the vendor on the purchaser's further default. *Held,* that the deed and contract did not rescind the former contract, but merely operated as a new agreement.

ESCROWS—AUTHORITY OF DEPOSITARY—WAIVER OF PERFORMANCE.
13. Under an agreement for forfeiture of a contract to convey on the purchaser's default, accompanied by a quitclaim deed from the purchaser deposited in a bank, the cashier was the vendor's agent in returning the purchaser's notes, making the cashier's failure to return the notes binding upon the vendor on a question whether right to declare a forfeiture was waived.

VENDOR AND PURCHASER—RESCISSION—AGREEMENT—WAIVER OF RIGHT.
14. A contract vendor waived the right to forfeit the contract for the purchaser's failure to make a payment at a fixed time in accordance with a subsequent agreement whereby the purchaser, being in default, agreed to deliver to the vendor a quitclaim deed, if the payments were not made by a certain date, by failing to surrender notes given by the purchaser, and was bound to give him reasonable notice and make a new demand before he could afterwards insist upon a forfeiture.

CONTRACTS—EXTENSION OF TIME—CONSIDERATION.
15. Since, under Section 776, L. O. L., a contract under seal imports a consideration, a contract under seal extending the time for performance of a contract is good though unilateral.

VENDOR AND PURCHASER—CONTRACT TO CONVEY—MODIFICATION.
16. An agreement reciting a contract, purchaser's default in paying an installment, and his desire until a fixed time in which to pay, and

providing for a rescission and forfeiture on his failure to make "said payment" does not require the payment to be made at that time; payment within a reasonable time being sufficient.

Equity—Equitable Relief—Doing Equity.

17. A contract purchaser seeking equitable relief against a forfeiture claimed by the vendor should be compelled to do equity concerning a judgment for a sale of his interest in the land under a judgment on an independent matter.

From Lane: Lawrence T. Harris, Judge.

Statement by Mr. Chief Justice Moore.

This is a suit by S. W. Miles against V. Hemenway to determine an adverse interest in real estate. A written contract was entered into whereby the defendant, V. Hemenway, stipulated to sell and convey to the plaintiff, S. W. Miles, a farm of 160 acres in Lane County, for $4,800, on account of which sum $1,000 was paid, the remainder of the consideration being evidenced by negotiable promissory notes, executed October 1, 1907, three for $1,000 each and one for $800, maturing in 2, 3, 4, and 5 years respectively, with interest at the rate of eight per cent from that date and payable annually. The writing stated that if Miles failed to make any of the payments as specified, the contract should thereafter be utterly void and all payments made thereon forfeited. Miles, without charge, occupied the real property, and, pursuant to agreement, liquidated the taxes imposed thereon amounting to $65.03, and also paid $304, the first installment of interest, when it matured. Hemenway and his wife, on October 5, 1908, executed to plaintiff a warranty deed of the land and deposited the instrument for him with the First National Bank of Eugene. When the first note and the second installment of interest became due, plaintiff was unable to meet the payment thereof, whereupon another written agreement was entered into by the terms of which the time for such payment was postponed ten days, or until October 11, 1909, at twelve o'clock noon, in consideration of which extension plain-

Sig. 11

tiff executed to defendant a quitclaim deed of all his interest in the premises, and these writings were also deposited with the bank. The latter agreement provided that if Miles failed to make the payment at the time named, the original contract, warranty deed, the supplemental agreement, and quitclaim deed should be delivered to Hemenway, and all engagements between the parties terminated without any claim on the part of either against the other. Miles was unable to meet the obligation at the hour specified. About 15 or 20 minutes thereafter he went to the bank with a person who agreed to loan him the money with which to pay the debt, but was informed that the papers had been surrendered. The sum so due was thereafter tendered to defendant, but upon his refusal to accept it, the money was deposited with the clerk of the court for him.

The complaint states in substance the facts hereinbefore set forth and avers in effect that the subsequent agreement was intended as a substitute for the original contract; that the quitclaim deed was designed as further security for the payment of the remainder of the consideration for the land, and that by demanding and accepting such indemnity, Hemenway waived the right to declare a forfeiture, if such prerogative theretofore existed; that defendant retained the negotiable promissory notes until October 14, 1909, when they were tendered to plaintiff, who returned them to the bank which had held them as collateral security for the payment of Hemenway's indebtedness; that plaintiff, having been informed, believes and alleges that defendant made statements to parties with whom plaintiff was negotiating for a loan to pay the note and installment of interest; that no forfeiture would be declared if the sums of money so due were not paid at the time specified; and that by his actions and interference the loan was not obtained until a few minutes after twelve o'clock noon of October

11, 1909; that plaintiff has paid on account of the purchase price of the land, $1,304, for taxes, $65.03; that he has made permanent improvements on the premises of the value of more than $1,000, no part of which has been repaid or tendered; that in consequence of the labor which he has performed on the farm and of such improvements the real property has become and is reasonably worth $9,600; and that plaintiff is in the exclusive possession of the entire land to which defendant, without authority, unlawfully asserts some adverse interest. The prayer of the complaint is that plaintiff's right to the premises may be declared to be subsisting; that the quitclaim deed which he executed be decreed to be a mortgage, and for such other and further relief as may seem just and equitable.

The answer denies the material averments of the complaint and alleges in substance that when the default occurred plaintiff instructed the officers of the bank to deliver the instruments to defendant, which direction was obeyed; and that Hemenway is the owner in fee of the land, to which plaintiff has no right in consequence of his failure to keep and perform the terms of his agreements. The prayer of the answer is that defendant be decreed to be the absolute owner of the real property and that the immediate possession thereof be awarded to him.

The reply having put in issue the allegations of new matter in the answer the cause was tried, resulting in a decree as prayed for by defendant and the plaintiff appeals.                                AFFIRMED.

Submitted on briefs without argument under the proviso of Rule 16 of the Supreme Court: 50 Or. 580 (91 Pac. x).

For appellant there was a brief over the names of *Mr. H. E. Slattery* and *Mr. F. H. Greenman.*

For respondent there was a brief over the names of *Messrs. Woodcock & Smith.*

Opinion by MR. CHIEF JUSTICE MOORE.

1. It is contended that the supplemental agreement and the quitclaim deed were executed and accepted as additional security for the payment of the sums of money maturing October 1, 1909, and such being the case, plaintiff's equity in the land could not be defeated by a declaration of forfeiture, nor terminated in any other manner than by a decree of foreclosure rendered by a court of equity in a suit instituted for that purpose. Assuming without deciding that the parties could impart to the transaction, which culminated in the making of the second agreement and the giving of the quitclaim deed, the legal effect which they then contemplated, the testimony will be examined, relating to the execution of these writings, to ascertain the intention prompting their consummation.

Miles testified that about September 28, 1909, he applied for a postponement in the payment of the money, maturing in two days, and was told by Hemenway that he wanted a quitclaim deed as security for the extension if granted. On cross-examination plaintiff stated that when the quitclaim deed was executed, his mind was not perfectly clear as to the title conveyed. He further said:

"I certainly looked upon it as additional security. * * I would not have given that quitclaim deed if I had had any idea that it would have ended everything so far as my title to the place, or equity, or anything of the kind was concerned. I would have let him begin proceedings in some way before I would have given it. That was my state of mind at the time."

In referring to the extension granted, Miles was asked by defendant's counsel:

"Well, didn't Hemenway, during all that time, have all of that land to secure what you owed him? Your equity, as your attorney says, as well as the legal title?"

The witness replied:

"Yes, I suppose so."

Q. "Then how could the quitclaim deed increase his security?"

A. "Well, as I stated a while ago, my mind is not perfectly clear on that, and was not at that time."

Hemenway, referring to the conversation which he had with Miles, regarding the extension, testified that he told him:

" 'I don't want this postponed from time to time.' He says, 'I don't either.' 'Well, now,' I says, 'you give me a quitclaim deed to this property and give yourself plenty of time to get the money—you say you can get it in a very few days—take ten days for it,' and he says, 'All right.' "

On cross-examination defendant testified that the purpose of taking the quitclaim deed was a desire on his part to get the place back without any legal proceedings, saying:

"I wanted it fixed so that there would not be any law about it. * * I told him I had to have the land or the money when I signed the last contract and got the deed, and he understood it thoroughly and perfectly."

We think an examination of the testimony referred to will show that while Miles states that Hemenway demanded the execution of the quitclaim deed as further security, plaintiff's subsequent cross-examination and defendant's sworn declarations, relating to this branch of the case, establish the fact that there was no meeting of the minds of the parties respecting the giving of additional indemnity, and hence there was no contract for security.

2. Considering the estates of the parties, respectively transferred and retained by the original contract, the interests of each will be examined. A court of chancery, invoking the maxim that what ought to be done, should be regarded as completed, treats an executory agreement

to sell and convey real property as a conversion, whereby an equitable interest in the land is secured by the purchaser for whom the vendor holds the legal title in trust: *Burkhart* v. *Howard*, 14 Or. 39 (12 Pac. 79) ; *Sayre* v. *Mohney*, 30 Or. 238 (47 Pac. 197) ; *Coles* v. *Meskimen*, 48 Or. 54 (85 Pac. 67) ; *Collins* v. *Creason*, 55 Or. 524 (106 Pac. 445).

3. The vendor's right to the consideration stipulated to be paid is in the nature of a charge on the land as security for the purchase money (*Savings Co.* v. *Mackenzie*, 33 Or. 209: 52 Pac. 1046), which equitable lien, upon default in the payment of the sums awarded by a court of equity, may become merged into the legal estate by a decree of strict foreclosure, which is in the nature of a conditional cancellation of the contract to convey (*Sievers* v. *Brown*, 34 Or. 454, 458: 56 Pac. 171: 45 L. R. A. 642), consisting of an alternate order, providing a definite time for the payment of the debt found to be due, and directing that upon a failure to discharge the obligation, within the time limited, the purchaser's equitable estate in the premises shall be forever barred: *Wollenberg* v. *Rose*, 41 Or. 314 (68 Pac. 804) ; *Flanagan Estate* v. *Great Cent. Land Co.*, 45 Or. 335 (77 Pac. 485) ; *Higinbotham* v. *Frock*, 48 Or. 129 (83 Pac. 536: 120 Am. St. Rep. 796). Such a suit is not governed by the statute (Section 423, B. & C. Comp.) which directs that a lien upon real property shall be foreclosed, and the land adjudged to be sold to satisfy the debt, and if it appear that a personal obligation has been given to evidence the payment of the sum due, a decree for the recovery thereof must be given: *Savings Co.* v. *Mackenzie*, 33 Or. 209 (52 Pac. 1046).

The same conclusion has been reached by the court of last resort of a sister state, where it was held that as the title to the land, agreed to be sold and conveyed, did not pass to the purchaser, that part of a decree foreclos-

ing the vendor's equitable lien which directed a sale of the premises and a recovery of any deficiency, was erroneous. *Button* v. *Schroyer,* 5 Wis. 598; *Baker* v. *Beach,* 15 Wis. 108; *Nelson* v. *Jacobs,* 99 Wis. 547 (75 N. W. 406). In *Sievers* v. *Brown,* 34 Or. 454, 458 (56 Pac. 171: 45 L. R. A. 642), it was intimated that a decree foreclosing a contract for the purchase of real property ought to direct a sale of the premises. While the suggestion might be the expression of an equitable principle, it must be regarded as inconsistent with the current of judicial enunciation.

In *Vernon* v. *Stephens,* 2 P. Wms. 66, which was a suit for specific performance, it appeared that an agreement had been made for the sale of land, pursuant to which the purchaser paid part of the consideration and afterwards stipulated to discharge the remainder by a designated day, in default of which to surrender the contract and to lose what he had paid thereon, and it was held that a court of equity would relieve him from the terms of the supplemental agreements with which he had not complied. In deciding that case, the Lord Chancellor, referring to the modified contracts, said:

"And as to these agreements, they were all intended only as a security for payment of the money, which end is answered by the payment of principal, interests, and costs."

The legal principle thus announced was reaffirmed in *Harris* v. *Greenleaf,* 117 Ky. 817 (79 S. W. 267: 4 Am. & Eng. Ann. Cas. 849) where it was determined that if, after the execution of a contract for the sale of land, the purchaser is induced to execute another agreement providing that upon failure to pay the full amount of the purchase price he should forfeit his contract and all his rights thereunder, the latter instrument, if valid, was merely a form of additional security. To the same effect are the cases of *Decamp* v. *Feay,* 5 Serg. & R. (Pa.) 323

(9 Am. Dec. 372), and *Kercheval* v. *Swope*, 6 T. B. Mon. (Ky.) 362.

4. The purport of these decisions, as we view it, is that while an original contract for the sale and conveyance of land may be modified by a later agreement, which stipulates that unless the remainder of the purchase price is paid on or before a specified day, the purchaser's right to specific performance shall be terminated and the payments which he has made on account of the contract forfeited, does not render the subsequent engagement self-executing, but it may be enforced according to its terms, either by a decree of a court of equity or by mutual assent of the parties. To this extent of the statement, an unqualified assent is given, but we do not acquiesce in the doctrine that the modifying agreement constitutes additional security.

The legal title held by Hemenway, in trust for Miles, being in the nature of an equitable lien, which could have been barred by a strict foreclosure, was not, in our opinion, such an interest in the premises as to be governed by the maxim, "once a mortgage, always a mortgage," for the legal title and the co-ordinate equitable lien never in a strict sense created a mortgage (*Glendenning* v. *Johnston*, 33 Wis. 347), and the quitclaim deed, though it may have been designed to evidence a surrender of the premises for a condition subsequent, the conveyance added no security to that already held by defendant. All the permanent improvements placed on, or made to, the land by Miles augumented the interest which Hemenway held by retaining the legal title, without the execution of the quitclaim deed. The possession of the premises not having been surrendered by plaintiff, pursuant to the terms of his deed, such pretended conveyance was useless, except as affording evidence, and a strict foreclosure or some other equitable intervention was essential to bar his rights or to cancel the contracts. The quitclaim deed did

not, in our opinion, increase the indemnity and could serve no purpose whatever, unless the land was voluntarily abandoned by the purchaser.

5. It is insisted that defendant prevented plaintiff from securing a loan of money with which to discharge the note and the installment of interest, and such being the case, an error was committed in denying the relief prayed for in the complaint. Miles testified that before such debts matured he applied to the Chambers Hardware Company, a private corporation, to which he was indebted, to borrow money to pay the sums which he owed on the land, offering as security a transfer of the legal title to the premises, the witness reserving authority to sell the real property as soon as possible, and from the consideration expected to be received, to pay the corporation the money to be advanced and interest thereon, and his prior debt and interest to the hardware company, and to retain the remainder; that the president of the corporation advised a conference with him before surrendering the land, and pursuant to such suggestion, he, on the morning of October 11, 1909, called upon Frank Chambers, the officer referred to, who soon thereafter, in response to a telephone call, said he was obliged to leave, but would soon return, asking Miles to wait; that the witness did so, and when Chambers came back the latter stated the corporation would not advance the money, whereupon the witness immediately started for the First National Bank of Eugene, where the contracts and deeds were deposited, but before he could reach the place, the noon hour arrived; and that he afterwards learned that the hardware company, prior to 12 o'clock M. of that day assigned its demands against him to Hemenway who also secured from the bank the transfer of a note which it held against the witness.

If defendant had by any means prevented plaintiff from obtaining a loan of money, so that the latter's estate in

the land might have been forfeited, it is probable that the supposed advantage taken by Hemenway would have defeated his application for affirmative relief, because he would not have come into a court of equity with clean hands. Miles was not hindered, evidently, by the bank's assignment of his note to Hemenway, for the plaintiff testified that after the expiration of the time limited, he applied to the president of such bank to borrow money, offering as security the same indemnity and terms which he had proposed to the hardware company, and was informed by that officer that a national bank could not make such loans. It will thus be seen that plaintiff could never have reasonably expected to secure a loan from a bank of that class by giving as security a conveyance of the land he had engaged to purchase.

Frank Chambers testified that in August, 1909, plaintiff applied to borrow money to take up the Hemenway contract and the witness refused the request. Referring to a conversation had with Miles at that time, Chambers said:

"I told him if he did not find anybody that would take it up, to come back and see me again. I think he saw me twice between that and the time of the last talk. That was October 11th, I think, was the date. That morning he came in about—if I remember—the hour was about nine o'clock. I turned him down, and told him, 'No, I didn't want it.' But I told him again, 'You go out and see if you can't find somebody that will take it up, and if you can't, why, come back.' At that time, I had not approached Mr. Hemenway to sell the notes * * I sent him out three times that forenoon to see if he could not find somebody else that would take it up. * * I figured with him. But I took the matter up of figuring on the indebtedness of the place, and found what it would be. After I found what it would be, I then sent him out, I think, and told him it did not suit me. And then I went to look up Mr. Hemenway. It took me possibly half an hour to find him. And I asked him—I told him I had some notes—and asked him if he wanted them. He did not give me a very satisfactory answer. I told him I

would like to know very soon if he wanted them, and he said, 'Well, I will see you again.' I told him I wanted him to see me very shortly; and I then went back to the store and attended to some other business, and took the matter up again with Mr. Miles. And in the meantime, I think while I was sitting there that time, I had a telephone call from the bank. That call was on other matters entirely. Didn't pertain to the Miles matter. But very soon I had another call, that Mr. Hemenway was at the bank waiting for me. I then went up and closed the deal with Mr. Hemenway. After that I went back and talked with Mr. Miles some. It was then after 11 o'clock, I think, and at a quarter to 12—I think it was a quarter to 12—or in a short time, I told him he had better go and look for somebody else to take the matter up. I think it was somewhere between half-past 11 and a quarter to 12, and he went out again and came back, I think after that. * *

"Q. Had you at any time assured him that you would furnish him the money?"

"A. I had at no time done anything but figure on what was against the place. He told me all that I asked, that I know of. He told me what it was. But at no time did I do anything but refuse to take it up, except to figure on what would be the conditions, in case it looked good enough for me to take it."

"Q. There has been some indication here that you and the bank were working together and trying to prevent Mr. Miles from raising the money, to help Hemenway out. What is the fact about that?"

"A. The fact was, that I was trying to collect money that was due from him. I was putting myself in a position to see how best I could do it."

The testimony of Chambers has been set forth at length, a careful perusal of which convinces us that he had not promised, and never intended, to advance the money to plaintiff. If, by the invitation to call upon the hardware company before he surrendered his interest in the property, or by furnishing to Chambers a statement of the sums due on the land, or in not sooner informing him that he could not obtain a loan from the corporation, Miles

reasonably expected to secure the money, the testimony fails to show that Hemenway was in any manner responsible therefor.  The defendant, it will be remembered, took from the hardware company and from the bank an assignment of obligations due from plaintiff, but Hemenway being also indebted to the bank, he may have been obliged to take a transfer of such indebtedness in order to obtain the means whereby he could protect his interests in the land.  However this may be, we are satisfied that defendant did not prevent or attempt to hinder plaintiff from borrowing from his creditors money with which to discharge the sums he owed on the land.

6. It is argued that conditions should be construed in equity so as to prevent forfeitures, which rule was violated by the trial court, whereby an error was committed. It must be conceded that compensation, and not forfeiture, is a well-recognized principle of equity jurisprudence, but this precept does not prevent parties, who are *sui juris,* from settling, without litigation, their respective rights.  The written agreement whereby the time for the payment of the first note and of the installment of interest on the others was postponed to 12 o'clock noon of October 11, 1909, contained clauses as follows:

"And in consideration of said extension of time, the party of the second part [Miles] has executed to the party of the first part [Hemenway] a quitclaim deed to all his right, title, and interest in said property, which said deed, together with this contract is to be deposited in the First National Bank where the other deed and contract is deposited, and said bank is instructed and the parties hereto as follows:  That if the said party of the second part fails to make said payments, then said original deed and contract, together with this contract and deed, is to be delivered to the party of the first part, and that all contracts and agreements between the parties hereto shall be at an end without any claim upon the part of either against the other."

The testimony of the officers of the bank is to the effect that after 12 o'clock noon of the day specified, in a conversation with them, Miles directed that the papers in their possession, relating to the land transactions, should be delivered to Hemenway, which order they obeyed. Miles, however, testified that when asked by such officers if the papers should be given to defendant, he told them: "If there is no other help." The cashier of the bank and his assistant, with whom plaintiff conversed on that occasion, severally denied upon oath that he ever made such a limited declaration, and the president of the bank, with whom Miles also talked, at that time, deposed that he did not remember that plaintiff ever made such a qualified assertion. So far as we are able to ascertain from an inspection of the testimony, the officers of the bank, who were witnesses at the trial of this cause, were unbiased, while Miles is necessarily very much interested in a determination of this suit in his favor. The preponderance of the testimony induces the conclusion that before plaintiff had found any person from whom he could obtain a loan of money, he unqualifiedly directed the officers of the bank to deliver to defendant the papers referred to in the supplemental agreement.

7. "The trust in real property, growing out of the contract for its purchase and sale," says a text-writer, "continues until either the contract is executed by the delivery and acceptance of the deed, or is mutually abandoned by the parties." Reeves, Real Property, § 404. From this excerpt it will be observed that the author omits to state that the vendor's equitable lien in the land agreed to be sold and conveyed could be strictly foreclosed, which decree, though resulting in an abandonment of the contract, might be given without the purchaser's consent. The language employed is quoted, however, to show that a land contract, like all other agreements, may be abrogated by mutual assent of the parties.

8. We do not attach any importance to the supplemental agreement, as a means sanctioned by equity to extinguish a purchaser's rights even upon failure to comply with the condition, and have treated the last contract as a favor granted plaintiff whereby the time for the payment of the debt was delayed ten days. However obligatory a stipulation may appear to be which provides for a forfeiture upon a breach of a condition, the confiscation is not usually complete, so as to vest the property in the party who is to take by the loss, without affirmative action on his part. 13 Am. & Eng. Enc. Law (2 ed.) 1077; *Minneapolis, R. Co.* v. *Duluth, R. Co.,* 45 Minn. 104, 106 (47 N. W. 464). If, therefore, under the supplemental agreement, a declaration of forfeiture was essential to terminate plaintiff's equitable estate in the land, such agreement could not alter the respective rights of the parties and was useless, except to change the day of payment specified in the original agreement.

9. It will be perceived that the same conclusion, practically, is arrived at herein as was reached in the case of *Vernon* v. *Stephens,* 2 P. Wms. 66, and in the cases which have adopted the doctrine there announced, as hereinbefore adverted to, but we put our determination, not on the ground that the supplemental agreement was designed as, or constituted, additional security, but that the modified agreement changed the original contract in the particulars specified.

The decision herein is grounded on the fact, which we think was established by a preponderance of the testimony, that after the expiration of the time limited by the second agreement, the officers of the bank, pursuant to plaintiff's direction, delivered the papers held in escrow to defendant, who accepted them. This transaction was tantamount to a declaration of forfeiture by Miles to which Hemenway assented, which acquiescence constituted the required affirmative act on his part to complete

the surrender of the respective rights of the parties. A refusal to recognize this legal principle would be a denial of the power of responsible parties voluntarily to settle their respective interests and estates in land; thereby making in all cases a resort to a court of equity indispensable, a doctrine to which we cannot assent.

10. It is maintained that the negotiable promissory notes, evidencing the remainder of the purchase price of the land, were unconditionally delivered, and while Hemenway may have left them at the bank for safe-keeping, they were at all times subject to his control and not in escrow; that they were not offered to plaintiff until after dark on October 14, 1909, and three days prior thereto he went to the bank, ready and willing to pay the sums due, but the notes had been delivered to defendant, who, without offering to return them to plaintiff, could not declare a forfeiture. These obligations were made payable at the First National Bank of Eugene and defendant testified that they were placed there as an escrow; that he borrowed from the bank some money and transferred to it, as collateral security, two of the notes and instructed the cashier that when Miles made a payment to indorse on the instruments the money received and also to give the witness credit for the sums so paid on his debt.

These notes were at the bank all the time after they were executed and Hemenway understood, at least, that they were there as an escrow. In referring to the notes and to the directions which he gave to the cashier at the time the contracts and deeds were returned to him, defendant testified:

"I told Snodgrass, I think it was, to hand them to Mr. Miles. They did not belong to me."

If the cancellation of the land contract depended upon Hemenway's option to declare a forfeiture, he would probably have been required to tender to Miles the negotiable instruments, as a condition precedent to the exer-

cise of that prerogative: *Comstock* v. *Brosseau,* 65 Ill.. 39. The cashier would have delivered the notes to plaintiff if a request therefor had been made by him, but because that officer of the bank, who was by the terms of the last agreement made the agent of both parties, did not tender the notes to Miles until the time stated does not, in our opinion, alter the rights of the respective parties. Hemenway supposed these negotiable instruments were in escrow, whether technically so or not, and when he directed the cashier of the bank to deliver them to Miles, he did all that could reasonably have been required of him under the circumstances.

It is insisted that in refusing to allow an additional reply and a supplemental complaint to be filed, errors were committed. The application to file these pleadings was addressed to the sound discretion of the court, and in denying the requests no abuse of careful judgment is manifest.

It follows from these considerations that the decree should be affirmed, and it is so ordered.     AFFIRMED.

Rehearing allowed April 4, decided July 5, 1911.
On respondent's rehearing decided August 1, 1911.

## ON REHEARING.

[117 Pac. 273.]

Opinion PER CURIAM.

The plaintiff being in the possession of certain real estate under a contract for the sale thereof from the defendant to himself, having paid a portion of the purchase price, began this suit to determine the adverse interest of the defendant in the land in question. Having been defeated in the circuit court, the plaintiff appealed, and this court heretofore affirmed the decision of the circuit court: *Miles* v. *Hemenway,* 111 Pac. 696. A rehear-

ing having been granted, we have again examined the questions involved. The facts are stated in the former opinion.

It is only necessary at this time to consider the legal effect of the quitclaim deed and the accompanying agreement there mentioned. It should be remembered that the plaintiff found himself unable to meet one of the installments due upon the contract, whereupon he executed a quitclaim deed to the defendant for the premises, and at the same time as part of the transaction the parties executed the writing here set out which for convenience will be called "Exhibit C."

"This agreement, entered into by and between V. Hemenway, party of the first part, and S. W. Miles, party of the second part, witnesseth: That whereas, on the 12th day of July, 1907, said parties entered into a contract by the terms of which the first party agreed to convey to the party of the second part the northeast quarter of section 32, township 17 south, range 4 west, Willamette Meridian, containing 160 acres more or less, and whereas the $1,000.00 with interest on deferred payments is now due and the party of the second part is unable to make said payments; and whereas, the party of the second part desires an extension of time as follows: He desires until October 11th, 1909, at 12:00 o'clock A. M. of said day in which to make said payments and in consideration of said extension of time the party of the second part has executed to the party of the first part a quitclaim deed to all his right, title and interest in said property, which said deed, together with this contract, is to be deposited in the First National Bank where the other deed and contract is deposited and said bank is instructed and the parties hereto as follows: That if the said party of the second part fails to make said payments, then said original deed and contract, together with this contract and deed, is to be delivered to the party of the first part, and that all contracts and agreements between the parties hereto shall be at an end without any claim upon the part of either against the other.

"In witness whereof, the said parties have hereto set their hands and seals this first day of October, 1909.

"V.  Hemenway    [Seal.]
"S. W. Miles      [Seal.]

"In the presence of
   "A. C. Woodcock,
   "Zelma Edwards."

We adhere to the principle laid down in the former opinion that responsible parties may voluntarily settle their respective interests and estates in land and may discharge their obligations to each other by a conveyance of land; but, as in all other cases, such a conveyance must be unconditional and be taken in payment or discharge of subsisting obligations.

11. The question to be determined here is whether the quitclaim deed and Exhibit C, accompanying the same, constituted a rescission of the former contract for the sale of the premises or whether it operated as a new contract between the parties.  A rescission contemplates not only the destruction of the contract, but also the restoration of the parties to their former estate or situation.

12. The transaction mentioned did not produce such a result, because, on the one hand, Miles did not surrender the possession of the land, and, on the other, Hemenway did not return the notes which Miles gave for the purchase price.  Two of the notes had been indorsed by Hemenway, and were held at the time by the bank as collateral security for indebtedness owing by him to the bank.

13.  It is true he says he told the cashier to give up these notes to Miles, but, without dispute, they were not offered to Miles until some days after the quitclaim deed had been surrendered to Hemenway by the officers of the bank.  For the purpose of delivering these notes, the cashier was the agent of Hemenway and the latter must be bound by the act or failure to act on the part of his agent.

14. In legal contemplation, Hemenway had not surrendered the notes, and, conceding that he had a right at 12 o'clock noon on October 11th to declare a forfeiture, his failure to surrender the notes would be a waiver of his right to declare the forfeiture at that time. He could not afterwards insist upon a forfeiture without giving reasonable notice to Miles and making a new demand for payment of the balance due on the purchase price: *Graham* v. *Merchant,* 43 Or. 294 (72 Pac. 1088). That the transaction was still open, preventing a forfeiture, see *Bickel* v. *Wessinger,* 58 Or. 98 (113 Pac. 34, 38).

A strict analysis of Exhibit C discloses by recitals that the party of the second part is unable to make the payments required by the original contract, including not only the one then due, but also the deferred payments. It also recites that the party of the second part desires an extension of time, but it does not disclose anywhere that Hemenway agreed to extend the time.

15. So far as the extension of time is concerned, the agreement is unilateral. It having been executed under seal, however, Exhibit C may be said to be supported by a sufficient consideration, for the seal is primary evidence of consideration. Section 776, L. O. L.

16. It is said wtih reference to the quitclaim deed "that if the said party of the second part fails to make said payment," Exhibit C and the quitclaim deed should be delivered to the party of the first part. No time is specified in Exhibit C within which said payments are to be made. It is set out, as above stated, that Miles "desires until October 11, 1909, at 12 o'clock A. M.," but it is not prescribed that he should make the payments at that time, or at any other particular time. Indeed, time is not made the essence of this agreement or of the original agreement; hence we must construe Exhibit C as to the time of payments to mean that such payments must be made within a reasonable time. Taking the quitclaim deed and

Exhibit C together, they amount in legal effect to a contract in which Exhibit C is in the nature of a defeasance of the quitclaim deed, the whole having a general consequence like the former agreement.  The complete transaction as evidenced by the deed and Exhibit C is in the nature of a further assurance from the plaintiff to the defendant for carrying out the original obligation to pay the purchase price of the land.  The deed is substantially a renewed acknowledgment of the defendant's legal title in the land, but the defendant took said deed, like any other grantee in a quitclaim deed, affected by the principles of *caveat emptor,* and all the more in this case because he had actual knowledge of the equities of Miles in the land.  It was, at least, enhanced security to Hemenway because it includes in one and hastens the deferred payments on the land.  In other words, the effect of Exhibit C, including, as it does, all the payments, was to make new terms whereby the transaction should be ended once for all, either upon payment of the whole balance of the purchase price, or render Miles liable to a strict foreclosure of his rights in the premises.  If Miles had paid in full the balance of $3,800 remaining of the purchase price, the quitclaim deed would not have been lawfully deliverable.  On the other hand, failure to pay, installed the new contract declared by the quitclaim deed and its defeasance, Exhibit C, by which a strict foreclosure is incurred for the full balance of the price remaining unpaid.

So far as mere words are concerned, the original contract is in form not less absolute than the quitclaim deed and Exhibit C in providing for a forfeiture in case the plaintiff fails to pay to the uttermost farthing.  But equity looks to the substance rather than to the form.  Things which are equal to the same thing are equal to each other, and if, as shown in the former opinion, it would require a strict foreclosure to divest the plaintiff of his equitable

estate in the land under the original contract, the same
process ought to be necessary to dispose of the similar
situation arising under the analogous contract resulting
by legal effect from the quitclaim deed and Exhibit C.

17. Another matter here claims our attention. During
the pendency of this suit, Hemenway commenced an action
at law in the circuit court against Miles upon the accounts
of the Chabmers Hardware Company and the note of the
First National Bank of Eugene against Miles, all of which
had been assigned to Hemenway and about which some
mention is made in the testimony. A writ of attachment
was issued and levied upon the interest of Miles in the
land in dispute so far as it could lawfully be done. That
action proceeded to judgment on March 10, 1910, in favor
of Hemenway and against Miles for the sum of $332.20,
with interest at 10 per cent per annum from that date
until paid, for the further sum of $334.50, with interest
at eight per cent per annum from then until paid, $30
attorney's fees, costs, and disbursements, also an order
that the real property in question be sold for the satisfac-
tion of that judgment.

At the proper time, the plaintiff here moved the circuit
court for leave to file a supplemental complaint, alleging,
in substance, what has been here stated about that judg-
ment, relying upon the matter as a confession of the title
of Miles in the land and a waiver on the part of Hemen-
way of the right to declare a forfeiture on the original
contract. The court denied his motion to file the supple-
mental complaint, and also refused to allow Miles to intro-
duce the judgment roll in the law action in evidence for
the same purpose in the equity case.

Without deciding whether or not the court erred in
denying the right to file the supplemental complaint or to
give these matters in evidence, it sufficiently appears from
plaintiff's own record that something is due from him to
Hemenway on account of those transactions. Miles in

seeking equitable relief should be required to do equity, and these matters ought to be considered in any decree rendered herein.

The conclusion follows that the decree of the circuit court will be reversed and the cause remanded with directions to the circuit court to ascertain the amount due from Miles to Hemenway on the judgment mentioned above, and then to enter a decree, in substance, that the plaintiff Miles shall pay into that court for the use of the defendant, on or before 90 days after the date of such decree, the sum of $3,800, with interest thereon at the rate of eight per cent per annum since October 1, 1908, until paid, together with the amount due upon such judgment at the time of payment, and that in default of such payment, in full, the plaintiff be forever barred and excluded as upon a strict foreclosure from asserting or claiming any right, title, interest, or estate, either in law or equity, to the real property in question; and, further, that upon such payment being made as required by the decree, the defendant shall, within ten days thereafter, make, execute under his hand and seal, in the presence of two subscribing witnesses, acknowledge so as to entitle the same to record, and deliver to the clerk of the circuit court for the plaintiff a deed conveying from the defendant to the plaintiff the unincumbered fee-simple title to the real property in question and deliver to the clerk for the plaintiff the promissory notes mentioned in the pleadings in this suit, or that in default of the execution and delivery of such deed as so required, the decree shall stand and operate in all things as such deed of conveyance.

Neither party should recover costs or disbursements from the other.                                    REVERSED.

Mr. Chief Justice EAKIN did not participate in the rehearing of this cause.

Decided August 1, 1911.
RESPONDENT'S PETITION FOR REHEARING.
[117 Pac. 275.]

Opinion Per Curiam.

The defendant's petition for rehearing presents no new question, argument, or precedent to lead the court to a conclusion different in the main from the decision at which we arrived on the rehearing of this case.

It is only necessary to reiterate in substance that the effect of the dealings between the parties relating to the Miles deed deposited in escrow and the writing, Exhibit C, accompanying the same, was to substitute one conditional agreement for another concerning the sale of the land. The condition makes it analogous to security for the balance of the purchase price remaining unpaid, and requires foreclosure to divest the purchaser of his equity arising from his having paid part of the price, entered into possession and made valuable permanent improvements on the land. Of course the parties might settle their differences by the vendee making an absolute deed to the vendor and surrendering possession; but when the deed is attended with a conditional defeasance, as this one was, it falls short of a final conclusion of the whole matter. Moreover, the broad principles of equity are not fettered by fractions of an hour and a court of conscience will go far to prevent an overreaching forfeiture. The defendant, however, suggests that he has paid some taxes since the institution of this suit that should be taken into the account and the plaintiff states that the defendant has encumbered the land with a mortgage for $2,000 which ought to be abated from the balance of the purchase price necessary to be paid on the strict foreclosure decreed by this court.

Without comment upon this phase of the already complicated situation the decree here will be entered as already

directed on rehearing, but with leave to either party to
apply to the circuit court for permission to file supple-
mental pleadings and to take further proceedings not
inconsistent with the opinion rendered on rehearing.

FURTHER ORDER: REVERSED.